**GOOD GUSTAFSON AUMAIS LLP**
Christopher T. Aumais (Cal. Bar No. 249901)
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
cta@ggallp.com

**SHENAQ PC**
Amir Shenaq, Esq.*
3500 Lenox Road, Ste. 1500
Atlanta GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.*
100 S Commons, Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Pro hac vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jennifer Marino, individually, and on behalf of those similarly situated,<br><br>                    Plaintiff,<br><br>         v.<br><br>YummyEarth, Inc.,<br><br>                    Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

GOOD GUSTAFSON AUMAIS LLP

Plaintiff Jennifer Marino brings this action on behalf of herself, and all others similarly situated against Defendant YummyEarth, Inc. (collectively "YummyEarth" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This case arises from Defendant's deceptive and misleading practices with respect to its marketing and sale of their fruit snack products (the "Products").[1]

2. Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign focused on claims that appeal to health-conscious consumers – specifically the importance of real fruit and its presence in the Products.

3. Defendant engages in a deceptive marketing campaign to convince consumers that the Products contain the actual fruits shown and referenced in the marketing[2] and on the labeling[3] of the Products, they are nutritious and healthful to consume, and are more healthful than similar products.

---

[1] At the time of this filing, the following YummyEarth products are included in this definition: Organic Fruit Snacks, Organic Tropical Fruit Snacks, Organic Vitamin C Drops, Organic Fruit Chewys, and Organic Gummy Fruits. This definition is not exhaustive, and shall include all of Defendant's products that are similarly deceptively marketed.

[2] Variants of the words "marketing," and "market" refer to all forms of advertising in all forms of media, including but not limited to print advertisements, television, and radio commercials, Products' labels, viral marketing, incentives, and websites.

[3] The term "labeling" encompasses other descriptive terms, including various forms of the words: labels, labeling, packages, and packaging.

GOOD GUSTAFSON AUMAIS LLP

4.      Notably, the Products' names include "fruit" combined with references to fruit on the packaging, including, but not limited to, images of fruit, flavors bearing names of actual fruits, and references to health benefits associated with fruit.

5.      For example, the Organic Vitamin C Drops claim to include antioxidant fruits and has flavors of that reference names of fruits that are high in Vitamin C.



6.      Instead of containing real fruit – including the fruits referenced on the packaging – the Vitamin C Drops include high amounts of sugar while lacking any real fruit. Further, the only Vitamin C contained in the food item comes from added Ascorbic Acid which is a synthetic ingredient that mimics natural Vitamin C. In other words, despite representing that it includes real fruit that is high in Vitamin C and containing beneficial antioxidants, it is a fruit-less candy packed with sugar, that is boosted with a synthetic ingredient that is meant to mimic real Vitamin C.

7. This food item, like all of the Products, deceives consumers in a similar fashion. The deception lies in the fact that the Products are devoid of real fruit. Rather than containing real fruit, the Products are packed with sugar. Defendant's Products contain sugar levels comparable to candy and none of the vibrantly depicted fruits.

8. Thus, although Defendant markets the Products as containing real fruit while being healthful and nutritious, they are devoid of the health benefits reasonable consumers associate with consuming real fruit.

9. Reasonable consumers purchased the Products believing, among other things, that they were accurately represented. Specifically, reasonable consumers believed that the Products were healthful and contained real fruit. Reasonable consumers would not have purchased the Products if they had known about the misrepresentations and omissions or would have purchased them on different terms.

10. Defendant violated the trust of Plaintiff and Class Members because the Products are not the fruit-packed snack that Defendant's marketing and labeling represents.

11. Relying on Defendant's representations, consumers that seek healthier alternatives than mere candy only later realize that their purchase of Defendant's Products was a fruitless endeavor.

12. Plaintiff brings this action individually and on behalf of those similarly situated and seek to represent a National Class and a California Class. Plaintiff seeks damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits that Defendant have enjoyed from its deceptive business practices, as detailed herein. In addition, Plaintiff seeks

injunctive relief to stop Defendant's deceptive conduct in the labeling and marketing of the Products.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the Products to many locations within this District and hundreds of retail locations throughout the State of California, where the Products are purchased by thousands of consumers every day.

14.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff's purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## DIVISIONAL ASSIGNMENT

16.     Pursuant to Civil Local Rule 3-2(c-d), a substantial part of the events giving rise to the claims arose in San Francisco County, and this action should be assigned to the San Francisco Division.

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

## **PARTIES**

17.     Plaintiff Jennifer Marino is a citizen of California.

  a.  Prior to her purchase, Plaintiff saw and relied on Defendant's marketing and labeling representing that the Products contained the fruits that are named and depicted on the Products.

  b.  Plaintiff wished to purchase the snacks containing fruit for personal consumption. When Plaintiff saw Defendant's misrepresentations prior to and at the time of purchase, she relied on Defendant's prominent representations and claims about the Products. Specifically, that it contained the real fruit that Defendant emphasized in the marketing and on the labeling of the Product.

  c.  Plaintiff relied on the Defendant's representations, including but not limited to, the numerous "FRUIT" representations made throughout the Products as well as the fruit imagery that encompasses the entire packaging.

  d.  Plaintiff understood these representations to mean that real fruit was present in the Product. Had Plaintiff known the truth – that the Products did not contain any real fruit – Plaintiff would not have purchased the Products at a premium price. If Defendant started including real fruit, or the Products were no longer deceptively labeled, Plaintiff would purchase the Products again in the future. Plaintiff brings the claims below seeking damages, actual and statutory, as well as injunctive relief.

e.  Plaintiff has purchased the Products on multiple occasions. Plaintiff's most recent purchase of the Products occurred in January 2022, when she purchased the Yum Earth Organic Fruit Snacks at a price of approximately $3.99 per bag from a Walgreens store located in San Francisco, CA. Within the past three years, she has purchased the Products at Whole Foods, Walgreens, and other retailers in the San Francisco Bay Area.

18.  Defendant YummyEarth, Inc. is a Connecticut corporation with its principal place of business in Stamford, CT.

19.  Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who have knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant deceives consumers by misrepresenting that the Products contain real fruit.

20.  Consumers increasingly and consciously seek out healthy foods and snacks— placing value on healthy fruit-based snacks that contain less added sugar. Consumers seek these types of snacks for various reasons, including perceived benefits of avoiding disease, and attaining health and wellness for themselves and their children and families.[4]

---

[4] *See, e.g., Fruit Snacks Sales Rise by 162% Amid COVID-19 Pandemic* (April 29, 2020) https://www.prnewswire.com/news-releases/fruit-snacks-sales-rise-by-162-amid-covid-19-pandemic-301049556.html.

GOOD GUSTAFSON AUMAIS LLP

21.    In addition, scientific data shows that it is difficult to meet nutrient needs while staying within calorie requirements if you consume more than 10 percent of your daily calories from added sugar. Consumers seek healthier options by seeking to purchase snack products with less sugar. And scientific evidence indicates that excess sugar contributes to numerous chronic health problems such as heart disease and type 2 diabetes.[5]

22.    As a result, consumers are willing to pay, and have paid, a premium for products that contain real fruit over products that do not contain real fruit.[6]

23.    Companies such as the Defendant capitalize on the consumer's demand for real fruit and generate increased unit sales, revenue, and profit by making real fruit representations.

24.    Further, consumers rely on label representations and information in making purchasing decisions.

25.    Knowing this, Defendant prominently features real fruit statements and images throughout its packaging, labeling, and marketing.

    a. The Organic Fruit Snacks:

---

[5] American Heart Ass'n, *Understanding Childhood Obesity*, available at http://www.heart.org/idc/groups/heart-public/@wcm/@fc/documents/downloadable/ucm_428180.pdf.

[6] Mondelez International, *Fruitful Business: Fruit and Veggie Snack Trend Grows Stronger*, https://www.letschatsnacks.com/fruitfulbusiness ("Nielsen reveals that the snackable fruit and vegetable category is ripe with revenue, generating sales of $16.3 billion in the year ended May 27, 2017").

GOOD GUSTAFSON AUMAIS LLP

1
2
3
4
5
6
7
8
9
10
11
12

GOOD GUSTAFSON AUMAIS LLP

 

13   i.

14   ii.  "Organic fruit snacks" is placed in a large font in the center of the

15        principal display panel ("PDP").

16
17   iii.  In fact, it is presented in the largest font of any other text other

18        than the YUMEARTH brand name at the top.

19   iv.  It includes images of the "fruit snacks" which are molded to

20        resemble actual fruits: bananas, cherries, peaches, and

21        strawberries.

22
23   v.   Moreover, the four flavor names of these fruit snacks include the

24        fruits in the name: "Banana Blast," "Strawberry Smash," "Very

25        Very Cherry," and "Perfectly Peach."

26   vi.  Additionally, it includes images of these actual fruit items with

27        drawn-on smiley faces.

28

vii. Further, there is no indication on the PDP that the Organic Fruit Snacks fail to include any of the named fruits. Moreover, there is no indication that Organic Fruit Snacks are flavored by sources other than bananas, peaches, strawberries, or cherries.

b. The Organic Tropical Fruit Snacks:



i.

ii. "FRUIT SNACKS" is placed in a large font in the center of the PDP.

iii. In fact, it is presented in the largest font of any other text other than the YUMEARTH brand name.

iv. It includes images of the "fruit snacks" which are molded to resemble actual fruits: pineapples, mangos, and raspberries.

v. Moreover, the flavor names of these fruit snacks include the fruits in the name: "Playful Pineapple" and "Mango Tango."

GOOD GUSTAFSON AUMAIS LLP

vi. Further, there is no indication on the PDP that the Organic Tropical Fruit Snacks fail to include any of the named fruits. Moreover, there is no indication that Organic Fruit Snacks are flavored by sources other than the referenced fruits.

vii. In the large "MADE WITHOUT" box on the PDP, it fails to include "real fruit."

c. The Organic Chewys Fruit Chews:

 

i.

ii. "FRUIT CHEWS" is placed in a large font in the center of the PDP.

iii. Moreover, it shows the individual snacks and lists "Lemon," "Orange," "Strawberry," and "Cherry" directly below.

iv.  Further, there is no indication on the PDP that the Organic Fruit Chews fail to include any of the named fruits. Moreover, there is no indication that Organic Fruit Chews are flavored by sources other than lemons, oranges, strawberries, or cherries.

d.  The Organic Gummy Fruits:

 

i.

ii.  "ORGANIC GUMMY FRUITS" is placed in a large font in the center of the PDP.

iii.  In fact, it is presented in the largest font of any other text other than the YUMEARTH brand name.

iv.  It references "MIXED FRUITY FLAVORS."

v.  Moreover, the three flavor names include the fruits in the name: "Strawberry Smash," "Very Very Cherry," and "Perfectly Peach."

vi.  Further, there is no indication on the PDP that the Organic Gummy Fruits fail to include any real fruit. Moreover, there is no

GOOD GUSTAFSON AUMAIS LLP

1    indication that Organic Gummy Fruits are flavored by sources

2    other than peaches, strawberries, or cherries.

e.  The Organic Vitamin C Drops:



i.

ii.  Notably, it claims to contain "ANTIOXIDANT FRUITS" in all

capital letters in the center of the PDP.

iii.  Moreover, the four flavor names include the fruits in the name:

"Pomegranate Pucker," "Strawberry Smash," "Tooberry

Blueberry," and "Very Very Cherry."

iv.  Further, the PDP also references "vitamin c" which consumers

associate with one of the health benefits of consuming real fruit.

v.  Further, there is no indication on the PDP that the Organic

Vitamin C Drops fail to include any real fruit. Moreover, there is

no indication that Organic Vitamin C Drops are flavored by

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

sources other than pomegranate, blueberries, strawberries, or cherries.

26. Taken as a whole, the words and images used on Defendant's packaging leads consumers to believe that the Products contain real fruit.

27. As shown above, all the Products' present similar representations to the public which leads reasonable consumers, like Plaintiff, to believe that the Products contain the real fruits depicted throughout the labeling and marketing.

28. Rather, Defendant's Products are merely sugar-packed candy masqueraded as health-focused treats containing real fruit and nutrition.

29. This deception can also be highlighted by reviewing other products in Defendant's portfolio.

30. For example, Defendant's "Gummy Bears" present almost the exact same nutritional profile as the "Organic Fruit Snacks." Yet, unlike the fruit snacks, no reasonable consumer would perceive "Gummy Bears" to be a healthy snack choice.

31. They have the same calories (70), added sugar (12 grams), and fiber (0 grams) per serving. The "Organic Fruit Snacks" have higher Vitamin C levels than the "Gummy Bears," but this is not sourced from fruit. Rather, it is boosted by inserting synthetically derived Ascorbic Acid into the snack.

32. Both these snacks are devoid of fruit, packed with sugar, and for the most part, the "fruit" snacks are merely reformulated "Gummy Bears" with a dash of synthetic "Vitamin C" sprinkled into the snack.

33. In other words, morphing a bear into a banana and adding synthetic vitamins falls far short of consumer expectations and benefits from consuming snacks made with real fruit.

CLASS ACTION COMPLAINT

34.     The side-by-side comparison is striking:







35.     Not only are consumers misled but also competing products sharing the same shelves as Defendant's Products are placed at a competitive disadvantage.

36.     For example, these competing products are sold in the same stores as Defendant's Products yet - unlike the Products - these items do not make real fruit representations:

a. Albanese® Gummi Bears candy makes no fruit references and contains lower sugar levels than the Products.

 

b. HARIBO® Goldbears® candy includes images of fruit items yet no written fruit messaging and contains lower sugar levels than the Products.

GOOD GUSTAFSON AUMAIS LLP

 

c.  Great Value® Gummy Bears candy includes images of fruit items yet no written fruit messaging and contains lower sugar levels than the Products.



37.     In other words, while all of the above snacks are high in sugar and lack any real fruit, none of the competing products deceptively misrepresent that they contain real fruit.

38.     Not only do the Products fail to contain real fruit but also none of the flavor is derived from the depicted fruits.

39.     In fact, the "fruit" used in the Products is concentrated juice from apples and blackcurrant, and it is used solely for the purpose of coloring the Products to mimic the fruits depicted throughout the Products' packaging.

40.     None of the coloring comes from any of the depicted fruits.

41.     Defendant's deceptions harm not only consumers but also companies that accurately represent their products by diverting attention and dollars away from competitors that are good faith market participants.

**B. Defendant perpetuates this deception in its advertising and marketing.**

42.     Defendant's deceptions are not limited to the packaging. They further the deception through targeted marketing and advertising.

43.     Defendant's website emphasizes the fruit content and the health benefits of the Products.

44.     For example, Defendant's website includes numerous articles concerning healthy eating and presents real fruits and vegetables alongside the Products:



## 5 Tips for Better For You Snacking



## 4 Simple Lifestyle Changes for a Better Fall



## Simple and sweet back-to-school snack ideas

GOOD GUSTAFSON AUMAIS LLP

45.     Another example involves a mock interview with the Organic Fruit Snacks:[7]

## Our fan-favorite organic fruit snacks make the best back-to-school treats

**First Name:** Fruit E.

**Last Name:** Snacks

**Loves:** Being the center of attention with bursting bites of delicious fruit flavor. Lunchtime, snacktime and anytime smiles thanks to their organic, allergy-friendly ingredients. Endearing sweetness and strikingly colorful good looks are the product of real fruit juice, nothing artificial about this bushel.

**So Over:** Fake flavors, gluten, GMOs, dyes, and scene-hogging sandwiches who try to steal their school lunch thunder.

**For Your Flavor Consideration:** Banana, Strawberry, Cherry and Peach

**Happy to Share the Spotlight With:** Organic Tropical Fruit Snacks

**Fruity Beginnings**

It's as if YumEarth Organic Fruit Snacks were simply plucked from the orchards. But with lots of hard work and refinement, that fruit flavor was packaged into the sweet, shining snack star turning heads in supermarkets and winning the hearts and taste buds of kids and parents everywhere.

Never one to cut corners, or look for a shortcut to superstardom, this back-to-school celebrity delivers flavors that are as sweet as the first harvest. Absent are the artificial dyes, GMOs and allergy-inducing ingredients that leave snackers and lunch packers feeling empty. Each fruity bite is a burst of juicy deliciousness.

**A Pleasure to Snack With**

The perfect back-to-school snacks are loved by both parents and kids alike, and this Fruit Snack is perfect for the part. They're deliciously fun on their own, or ready to turn up the fruit flavor as part of a lunchtime ensemble. Either way, the audience will love how these allergy-friendly snacks steal the scene every time.

Really want to crank up the fruity fun? See what happens when these Organic Fruit Snacks team up with YumEarth Organic Tropical Fruit Snacks. It's a flavorific fruit salad with a tropical vibe.

46.     Additionally, it uses social media marketing campaigns to perpetuate the myth that the Products contain real fruit:

---

[7] https://yumearth.com/blogs/sweet-source/back-to-school-snacks-organic-fruit-snacks (emphasis added)

CLASS ACTION COMPLAINT

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP



47.    Instead, Defendant fails to include any real fruit in the Products.

48.    Therefore, the Products contain no dietary fiber, a key health-promoting component of real fruit nor any of the other health benefits of real fruit.

49.    Further, Defendant's marketing attempts to position itself as the healthier alternative to the competition. For example:



50.     Noticeably missing from the chart is "no real fruit."

51.     While fruit snacks from competitors contain real fruit – or at least fruit juices derived from the fruits depicted – Defendant's Products contain neither.

52.     Defendant targets its deceptions to consumers demanding health focused products.

53.     Instead of receiving a healthy snack made from real fruit, each serving of the Products contains more sugar per serving than other snacks that do not target health focused consumers.

54.     The Products contain a minimum of 11 grams of sugar in each serving which is the same amount of sugar as some popular candies:

One Tootsie Pop contains 2.25 teaspoons of sugar as well.



**A Tootsie Pop.**  Crystal Cox/Business Insider

There are also 2.25 teaspoons of sugar in one fun-size package of Skittles.



**A fun-size bag of Skittles.**  Crystal Cox/Business Insider

55.     Further, the amount of sugar present in each serving of the Products ranges from 11 grams to 36 grams.

56.     For example, the Organic Fruit Snacks contain 36 grams of sugar per serving.

57.     These levels are similar to a can of Sprite or 7-Up (each have 38 grams of sugar per serving).



58.     Additionally, the 36 grams of sugar present in the Organic Fruit Snacks is 150% of the recommended daily intake for women and children.[8]

59.     Thus, the Products contain no real fruit – and none of the health benefits associated with the consumption of real fruit – while containing high levels of sugar that are higher than many food items that consumers consider unhealthy.

60.     Through targeted marketing and advertising, Defendant perpetuates the misrepresentation that their Products contain real fruit.

_____

[8] 24 grams for women and children. American Heart Association, *Added Sugars, available at* https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/sugar/added-sugars.

GOOD GUSTAFSON AUMAIS LLP

61.     The practice of deceptively marketing fruit snacks as containing substantial amounts of fruit when they do not is well-recognized, and the Center for Science in the Public Interest has been outspoken in its criticism: [9]

> Food companies aggressively market phony fruit snacks to toddlers, children, and their parents, pushing them as healthy options and substitutes for real fruit. Unfortunately for parents and kids, **phony fruit snacks don't always contain the fruits advertised on the front of the box** and never in the quantities suggested. Instead, companies use relatively cheap, nutritionally void, and highly processed pear, apple, and white grape juices, **making phony fruit snacks much closer to gummy bears than actual fruit**.

62.     The Center for Science in the Public Interest's infographic provides additional analysis of this problem:



[9] CSPI website, Nutrition Policy, Fruit Fraud, http://cspinet.org/nutritionpolicy/fruitfraud.html (emphasis added).

– 23 –

63.    In this case, the Products' first two ingredients are added sugars: organic cane sugar and organic rice syrup.

64.    This is the exact scenario shown in the CSPI infographic.

65.    Simply, "[t]hese aren't fruit snacks... these sugar-laden treats are 'Phony Fruit Snacks.'"[10]

66.    Added sugars represent 100% of the sugars contained in the Products.

67.    Diets high in added sugars – from such foods as sugar-sweetened snacks like the Products – squeeze healthier foods out of the diet, thereby displacing foods that provide nutrients that reduce the risk of osteoporosis, cancer, heart disease, stroke, and other health problems.[11]

68.    Diets rich in added sugars contribute to obesity, the prevalence of which has risen dramatically in the last three decades in both youths and adults.[12] Obesity, in turn, increases the risk of diabetes, heart disease, high blood pressure, and other health problems.[13] In people who are insulin resistant, high intakes of added sugars increase levels of blood triglycerides, which are associated with a higher risk of heart

---

[10] CSPI website, *Phony Fruit Snacks, available at* http://cspinet.org/nutritionpolicy/fruitfraud.html.

[11] *See* S. Bowman, *Diets of Individuals Based on Energy Intakes from Added Sugars*, 12 FAMILY ECON. NUTRITION REV. 31-8 (1999); G. Mrdjenovi & D.A. Levitsky, *Nutritional and Energetic Consequences of Sweetened Drink Consumption in 6- to 13-year-old Children*, 142 J. PEDIATRICS 604-10 (2003).

[12] See D.S. Ludwig, K.E. Peterson & S.L. Gortmaker, *Relationship between Consumption of Sugar-sweetened Drinks and Childhood Obesity*, 357 LANCET 505-8 (2001); C.S. Berkey, H.R. Rockett, A.E. Field, et al., *Sugar-added Beverages and Adolescent Weight Change*, 12 OBESITY RES. 778-88 (2004); C.M Apovian, *Sugar-sweetened Soft Drinks, Obesity, and Type 2 Diabetes*, 292 J. AM. MED. ASS'N 927-34 (2004); Ctr. for Disease Control and Prevention, Nat'l Ctr. for Health Statistics, *Prevalence of Overweight among Children and Adolescents: United States, 1999-2002*, *available at* www.cdc.gov/nchs/products/pubs/pubd/hestats/overwght99.htm.

[13] U.S. Surgeon General, U.S. Dep't of Health and Human Serv., *The Surgeon General's Call to Action to Prevent and Decrease Overweight and Obesity* (2001). available at www.surgeongeneral.gov/topics/obesity/calltoaction/CalltoAction.pdf.

– 24 –

GOOD GUSTAFSON AUMAIS LLP

disease and diabetes.[14] In addition, frequent consumption of foods rich in added sugars increases the risk of osteoporosis.[15]

69.     Defendant's claims about the fruit content of the Products are deceptive. Although the marketing and labeling of the Products depict certain fruits, those fruits are not the predominant ingredient nor are they even present in the Products. Instead, the Products contain significant amounts of added sugars.

70.     As a result of their unlawful, unfair, and fraudulent advertising and marketing practices, Defendant has made millions at the expense of the public health and trust, and continue to make millions through these unfair, unlawful and fraudulent advertising and marketing practices.

## C. The Products are misbranded.

71.     Under FDCA section 403, a food is "misbranded" if "its labeling is false or misleading in any particular." *See* 21 U.S.C. §§ 343(a).

72.     The amount of fruit in the Products has a material bearing on price and consumer acceptance. Moreover, Defendant's marketing and labeling of the Products — including imagery and references of certain fruits — creates the erroneous impression that the fruit depicted in the Products' marketing and labeling is present in an amount greater than is actually the case.

73.     Defendant's Products contain no real fruit.

---

[14] M.J. Stampfer, R.M Krauss, J. Ma, et al., *A Prospective Study of Triglyceride Level, Lowdensity Lipoprotein Particle Diameter, and Risk of Myocardial Infarction*, 276 J. AM. MED. ASS'N 882-8 (1996).

[15] S.J. Whiting, A. Healey & S. Psiuk, *Relationship between Carbonated and Other Low Nutrient Dense Beverages and Bone Mineral Content of Adolescents*, 32 NUTRITION RES. 1107-15 (2001).

GOOD GUSTAFSON AUMAIS LLP

74.     Because the Defendant fails to reveal the basic nature and characterizing properties of the Products (specifically, the true fruit content), Defendant's Products are not only sold with misleading labeling but also misbranded under Sections 403(a) of the Food Drug & Cosmetic Act ("FDCA"), 21 U.S.C. §§ 343(a), and cannot be legally manufactured, advertised, distributed, or sold in the U.S. as it is currently labeled. *See* 21 U.S.C. § 331.

75.     Moreover, California law forbids the misbranding of food in language largely identical to that found in the FDCA.

76.     The Products are misbranded under California's Sherman Law, Cal. Health & Safety Code §§ 109875-111915. The Sherman Law expressly incorporates the food labeling requirements set forth in the FDCA, *see* Cal. Health & Safety Code § 110100(a), and provides that any food is misbranded if its nutritional labeling does not conform to FDCA requirements. *See id.* § 110665; *see also id.* § 110670.

77.     The Sherman Law further provides that a product is misbranded if its labeling is "false or misleading." *Id.* § 110660. It is a violation of the Sherman Law to advertise any misbranded food, *id.* § 110398; to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded, *id.* § 110760; to misbrand any food, *id.* § 110765: or to receive in commerce any food that is misbranded or deliver or proffer it for delivery, *id.* § 110770.

78.     By misrepresenting the basic nature and characterizing properties of the Products, Defendant violates these federal and state regulations and mislead Plaintiff and consumers alike.

### D. Reasonable consumers relied on Defendant's misrepresentations to their detriment.

79.    Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

80.    Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

81.    Defendant's deceptions have been felt throughout the marketplace. For example:

★★☆☆☆  **Not Real Fruit**
Reviewed in the United States on September 16, 2015
Flavor Name: Fruit Flavor  |  Size: 43 Count (Pack of 1)  |  **Verified Purchase**

I didn't realize these were gummies. I thought I was ordering dried fruit snacks. Since this company also makes gummies that are named as such I am not sure what the difference is...
Also the packets have a tiny amount each so cost per packet is really high.

★☆☆☆☆  **Gross**
Reviewed in the United States on February 13, 2021
Flavor Name: Fruit Flavor  |  Size: 43 Count (Pack of 1)  |  **Verified Purchase**

Nasty. For some reason I thought I was buying dried fruit, but these are gummies, except nasty tasting. Actually tastes like cough syrup. Welches are much better! I bought these to take on a section hike but will either throw them out or leave in a hiker box.

★☆☆☆☆  **NOT The Original - That had Vit C!**
Reviewed in the United States on November 21, 2020
Flavor Name: Fruit Flavor  |  Size: 43 Count (Pack of 1)  |  **Verified Purchase**

I used to buy these at Costco then here, because each pack claimed it had 100% vitamin C in the serving. Whether it was 100% or not no matter... but I was buying these for years as a tasty way to snack on C's several times a day. When the hell did this become JUST a sugary snack??

I missed that little point likely $100 or so ago, since spending $24 on this almost every month is not worth it, if it's just gummies. Feel pretty stupid I never noticed the change and of course never thought to check if the MAIN health draw was non existent! Glad however that I suddenly noticed the difference in the packaging ingredients and can stop wasting my money on just basic surgery gummies. SMH

★☆☆☆☆  **Flavorless Waste of Money**
Reviewed in the United States on July 2, 2019
Flavor Name: Tropical Fruit  |  Size: 0.7 Ounce (Pack of 43)  |  **Verified Purchase**

Except for a hint of pineapple flavor, these all taste the same. I wouldn't mind if they tasted good, but they taste like a mixture of sugar and wax. I purchased these thinking I got a good deal on a bulk healthy fruit snack. However, no matter how good of a deal these were it was money down the drain because they taste horrible. I would not suggest buying these.

★☆☆☆☆  **Zero fruit flavor.**
Reviewed in the United States on March 2, 2020
Flavor Name: Fruit Flavor  |  Size: 43 Count (Pack of 1)  |  **Verified Purchase**

These taste nothing like fruit or any other food I can think of. They're not inedible but not worth buying.

CLASS ACTION COMPLAINT

82.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled the Plaintiff and the Class Members.

**E. Defendant's wrongful conduct caused Plaintiff's and the Class Members' injuries.**

83.    Defendant knows that consumers are willing to pay more for fruit snacks with substantial amounts of real fruit due to the perception that the snacks are higher quality and a healthier alternative to the competition.

84.    As a result of these unfair and deceptive practices, Defendant has likely collected millions of dollars from the sale of the Products that they would not have otherwise earned. Plaintiff and Class Members paid money for fruit snacks that are not what they purported to be or what they bargained for. They paid a premium for the Products when they could have instead bought other, less expensive products that do not purport to made with real fruit.

85.    In making the false and misleading representations described herein, Defendant knew and intended that consumers would pay for, and/or pay a premium for, a product labeled and advertised as containing real fruit.

86.    As an immediate, direct, and proximate result of Defendant's false and misleading representations, Defendant injured the Plaintiff and the Class Members in that they:

a.    Paid a sum of money for Products that were not what Defendant represented;

GOOD GUSTAFSON AUMAIS LLP

b.  Paid a premium price for Products that were not what Defendant represented;

c.  Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted;

d.  Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

e.  Could not be used for the purpose for which they were purchased; and

f.  Were of a different quality than what Defendant promised.

87.  Had Defendant not made the false, misleading, and deceptive representations, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Products.

88.  Plaintiff and the Class Members paid for Products that were purported to contain real fruit but received Products that were devoid of real fruit.  The products Plaintiff and the Class Members received were worth less than the products for which they paid.

89.  Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost of competitive products not bearing the representations.

90.  Plaintiff and the Class Members all paid money for the Products. However, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations. Plaintiff and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the Products. Consequently, Plaintiff

and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

## CLASS DEFINITIONS AND ALLEGATIONS

91.     Plaintiff, pursuant to Federal Rule of Civil Procedure 23, brings this action on behalf of the following classes:

>  a.  California Class: All persons who purchased Defendant's Products within the State of Oregon and within the applicable statute of limitations;
>
>  b.  Nationwide Class: All persons who purchased Defendant's Products within the United States and within the applicable statute of limitations period (collectively, the "Class," "Classes," and "Class Members").

92.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

93.     The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, hundreds of thousands of units of the Products to Class Members.

94.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

a. whether Defendant misrepresented material facts concerning the Products on the packaging of every product;

b. whether Defendant misrepresented material facts concerning the Products in print and digital marketing of every product;

c. whether Defendant's conduct was unfair and/or deceptive;

d. whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

e. whether Plaintiff and the Class are entitled to equitable and/or injunctive relief;

f. whether Defendant breached implied and express warranties to Plaintiff and the Class; and

g. whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

95. Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the classes, purchased Defendant's Products bearing the fruit representations and Plaintiff sustained damages from Defendant's wrongful conduct.

96. Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel that is experienced in litigating complex class actions.

97. Plaintiff has no interests which conflict with those of the Classes.

98. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

– 31 –

encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

99.     The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

100.    The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

**GOOD GUSTAFSON AUMAIS LLP**

## **CAUSES OF ACTION**

### **COUNT I**
**Violation of California's Unfair Competition Law ("UCL")**
**Business and Professions Code § 17200 et seq.**
**(On Behalf of the California Class)**

101.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102.    Plaintiff brings this cause of action pursuant to the UCL on their own behalf and on behalf of all other persons similarly situated.

103.    The UCL prohibits "any unlawful, unfair... or fraudulent business act or practice." Cal. Bus & Prof. Code § 17200.

**A.  Unfair Prong**

104.    Under the UCL a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).

105.    Defendant's advertising and labeling of the Products as being made with real fruit when the Products contain no real fruit, is false, misleading, and deceptive.

106.    Additionally, Defendant's advertising and labeling of the Products as being made with real fruit when the Products contain no real fruit, is false, misleading, and deceptive.

107.    Defendant's false advertising of the Products causes injuries to consumers, who do not receive the promised benefits from the Products in proportion to their reasonable expectations.

GOOD GUSTAFSON AUMAIS LLP

108.    Through false, misleading, and deceptive labeling of the Products, Defendant seeks to take advantage of consumers' desire for food products containing real fruit, while reaping the financial benefits of manufacturing lower quality Products.

109.    When Defendant labels and markets the Products as being made with real fruit it provides false promises to consumers and stifles competition in the marketplace.

110.    Consumers cannot avoid any of the injuries caused by Defendant's false and misleading advertising of the Products.

111.    Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under the UCL. The courts "weigh the utility of the defendant's conduct against the gravity of the harm alleged to the victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F. 3d 1152, 1169 (9th Cir. 2012).

112.    Defendant's material misrepresentations and omissions result in financial harm to consumers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of its harm.

113.    Some courts require the "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

114.    As described herein, Defendant's conduct impacts the public health of California citizens and the competitive landscape for Defendant's competitors that act as good faith market participants.

115.    Defendant's advertising and labeling of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unfair conduct.

116.    Defendant knew or should have known of its unfair conduct.

117.    As alleged in the preceding paragraphs, the material misrepresentations by Defendant detailed above constitute an unfair business practice within the meaning of the UCL.

118.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein. Defendant could have marketed the Products without making any false and deceptive statements about the Products' ingredients.

119.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on hundreds of occasions daily.

120.    Pursuant to Business & Professions Code Section 17203, Plaintiff and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising and labeling of the Products. Plaintiff and California Class Members additionally request an order awarding Plaintiff and California Class Members restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

121.    Plaintiff and the California Class have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff paid an unwarranted premium for the Products.

**B. Fraudulent Prong**

122.    The UCL considers conduct fraudulent and prohibits said conduct if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

123.    Defendant's labeling and advertising of the Products as being made with real fruit is likely to deceive members of the public into believing that the Products contain real fruit.

124.    Defendant's advertising of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes fraudulent conduct.

125.    Defendant knew or should have known of its fraudulent conduct.

126.    As alleged in the preceding paragraphs, the material misrepresentations and omissions by Defendant detailed above constitute a fraudulent business practice in violation of the UCL.

127.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Defendant could have refrained from marketing and labeling the Products as being made with real fruit.

128.    All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on hundreds of occasions daily.

129.    Pursuant to Business & Professions Code Section 17203, Plaintiff and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products. Likewise, Plaintiff and the California Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

130.    Plaintiff and the California Class have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct. Plaintiff and the California Class paid an unwarranted premium for the Products. Plaintiff and the California Class would not have purchased the Products if they had known that the Products they did not contain real fruit.

**C. Unlawful Prong**

131.    The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

132.    Defendant's labeling and advertising of the Products, as alleged in the preceding paragraphs, violates California Civil Code Section 1750, et seq. (Consumer Legal Remedies Act), California Business and Professions Code Section 17500, et seq. (False Advertising Law), Cal. Heath & Saf. Code § 110765 et seq. (the "Sherman Law"), and the common law as described herein.

133.    Defendant's packaging, labeling, and advertising of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable, and constitutes unlawful conduct.

134.    Defendant knew or should have known of their unlawful conduct.

135.    As alleged in the preceding paragraphs, the misrepresentations by Defendant detailed above constitute an unlawful business practice within the meaning of the UCL.

136.    There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein. Defendant could have refrained from misrepresenting the true characteristics of the Products.

137.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

138.    Pursuant to California Business and Professions Code Section 17203, Plaintiff and the California Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products. Likewise, Plaintiff and the California Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Defendant by means of responsibility attached to Defendant's failure to disclose the existence and significance of said misrepresentations in an amount to be determined at trial.

139.    Plaintiff and the California Class have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiff paid an unwarranted premium for the Product. Plaintiff would not have purchased the

GOOD GUSTAFSON AUMAIS LLP

Products if she had known that Defendant purposely deceived consumers into believing that the Products contained real fruit.

140.   As a result of the business acts and practices described above, Plaintiff and members of the California Class, pursuant to § 17203, are entitled to an order enjoining such future wrongful conduct on the part of Defendant and such other orders and judgments that may be necessary to disgorge Defendant's ill-gotten gains and to restore to any person in interest any money paid for the Products as a result of the wrongful conduct of Defendant.

141.   Pursuant to Civil Code § 3287(a), Plaintiff and the California Class are further entitled to prejudgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the California Class are entitled to interest in an amount according to proof.

**COUNT II**
**Violation of California's False Advertising Law ("FAL")**
**Business and Professions Code § 17500 et seq.**
**(On Behalf of the California Class)**

142.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

143.   Plaintiff brings this cause of action pursuant to the FAL on their own behalf and on behalf of all other persons similarly situated.

144.   The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, in any advertising device or in any other manner or means whatever, including over the Internet, any statement, concerning personal property or services, professional or otherwise, or

GOOD GUSTAFSON AUMAIS LLP

performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

145.   Defendant knowingly disseminated misleading claims regarding the Products in order to mislead the public about the presence of fruit in the Products.

146.   Defendant controlled the labeling, packaging, production and advertising of the Products. Defendant knew or should have known, through the exercise of reasonable care, that its representations and omissions about the characteristics and ingredients of the Products were untrue, deceptive, and misleading.

147.   Defendant understands that the public values real fruit representations, and this is shown by the numerous statements and fruit images that are prominently featured throughout the Products' packaging.

148.   Defendant's actions in violation of the FAL were false and misleading such that the general public is and was likely to be deceived.

149.   As a direct and proximate result of Defendant's conduct alleged herein in violation of the FAL, Plaintiff and members of the California Class, pursuant to § 17535, are entitled to an order of this Court enjoining such future wrongful conduct on the part of Defendant, and requiring Defendant to disclose the true nature of its misrepresentations.

150.   Plaintiff and the California Class have suffered injury in fact and have lost money as a result of Defendant's false representations. Plaintiff purchased the Products in reliance upon the claims and omissions by Defendant that the Products contain real fruit, as represented by Defendant's labeling and advertising. Plaintiff

GOOD GUSTAFSON AUMAIS LLP

would not have purchased the Products if she had known that the claims and advertising as described herein were false and misleading.

151.    Plaintiff and members of the California Class also request an order requiring Defendant to disgorge its ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendant by means of such acts of false advertising, plus interests and attorneys' fees.

**COUNT III**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**Business and Professions Code § 1750 et seq.**
**(Injunctive Relief Only)**
**(On Behalf of the California Class)**

152.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

153.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against the Defendant.

154.    At all times relevant hereto, Plaintiff and members of the California Class were "consumer[s]," as defined in Civil Code section 1761(d).

155.    At all times relevant hereto, Defendant is a "person," as defined in Civil Code section 1761(c).

156.    At all times relevant hereto, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in Civil Code section 1761(a).

157.    The purchases of the Products by Plaintiff and members of the California Class were and are "transactions" within the meaning of Civil Code section 1761(e).

GOOD GUSTAFSON AUMAIS LLP

158.   Defendant disseminated, or caused to be disseminated, through its packaging, labeling, marketing and advertising misrepresentations that the Products contained real fruit.

159.   Defendant's representations violate the CLRA in at least the following respects:

a.   In violation of Civil Code § 1770(a)(5), Defendant represented that the Products have characteristics, ingredients, uses, benefits, and quantities which they do not have;

b.   In violation of Civil Code § 1770(a)(7), Defendant represented that the Products are of a particular standard, quality, or grade, which they are not; and

c.   In violation of Civil Code § 1770(a)(9), Defendant advertised the Products with an intent not to sell the products as advertised.

160.   Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided notice to Defendant of the alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on April 25, 2022. As of the date of filing this complaint, Defendant has not responded. Accordingly, if after 30 days no satisfactory response to resolve this litigation on a class-wide basis has been received, Plaintiff will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

161.   Pursuant to California Civil Code § 1780, Plaintiff seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

162.   Defendant knew or should have known that the Products did not contain the claimed characteristics because Defendant manufactured, marketed and sold the Products without those characteristics that they claimed. Defendant knew or should

have known that the representations about The Products as described herein violated consumer protection laws, and that these statements would be relied upon by Plaintiff and members of the California Class.

163.   Defendant's actions as described herein were done with conscious disregard of Plaintiff's and California Class Members' rights and was wanton and malicious.

164.   Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendant is still representing that their Products have characteristics which they do not have.

## COUNT IV
### Breach of Express Warranty
### (On Behalf of the Nationwide Class)

165.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

166.   Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

167.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted and represented that the Products contain real fruit.

168.   Defendant provided the Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products contain real fruit.

169.   The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

170.   Defendant's express warranties, and its affirmations of fact and promises made to Plaintiff and Class Members regarding the Products, became part of the basis of the bargain between Defendant, Plaintiff, and the Classes, thereby

creating an express warranty that the Products would conform to those affirmations of fact, representations, promises, and descriptions.

171.    The Products do not conform to the express warranty because they do not contain any real fruit.

172.    Additionally, prior to the filing of this complaint, Plaintiff timely notified Defendant of these breaches via a letter sent via the U.S. Postal Service.

**COUNT V**
**Breach of Implied Warranty of Merchantability**
**(On Behalf of the Nationwide Class)**

173.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

174.    Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

175.    The Products are goods, and Defendant, as the manufacturer, marketer, distributor, and seller of the Products is a merchant under the law.

176.    Defendant developed, manufactured, distributed, marketed, advertised, and sold the Products directly to or for their eventual sale to end users.

177.    Defendant impliedly warranted to Plaintiff and Class Members, prior to their purchase of the Products, that the Products were merchantable and reasonably fit for the purposes for which such products are used and that the Products were acceptable in trade for the product description.

178.    Plaintiff and Class Members relied on statements made on Defendant's packaging, product labels, and in its marketing literature that the Products contained real fruit and were fit for the ordinary purposes for which such Products are used.

179.    Plaintiff and Class Members purchased the Products that were manufactured and sold by Defendant in consumer transactions. The implied warranty of merchantability attached to the sale of these Products.

180.    The Products do not meet the quality of their description because they do not contain real fruit.

181.    The Products are not adequately contained, packaged and labeled because they are packaged as containing real fruit, but instead the Products contain no real fruit.

182.    The Products also do not conform to the promises and affirmations of fact made on their containers, packaging and labels, website, and marketing literature because they do not contain real fruit as the Products' packaging and labeling warrants.

183.    Accordingly, Defendant breached its duty by selling to Plaintiff and Class Members Products that were not of merchantable quality. Therefore, Plaintiff and Class Members did not receive the Products as warranted. The products purchased by Plaintiff and Class Members were worth substantially less than the products Defendant promised and represented. Plaintiff and Class Members relied on Defendant's implied warranties concerning its Products and each Plaintiff sustained an ascertainable loss (financial injury) from Defendant's breach of the implied warranty of merchantability.

184.    Prior to the filing of this complaint, Defendant was provided written notice of these breached warranties.

185.    Defendant did not respond to this written notice.

GOOD GUSTAFSON AUMAIS LLP

GOOD GUSTAFSON AUMAIS LLP

186.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have suffered actual damages in that they have purchased Products of inferior quality and ingredients compared to how they were represented. Defendant's Products are worth far less than the price Plaintiff and the Class Members paid, and Plaintiff and Class Members would not have purchased the Products at all if they had known of the true quality and ingredients of the Products.

187.    Plaintiff, on behalf of herself and the Class Members, demands judgment against Defendant for compensatory damages for herself and each of the other Class Members, as well as attorneys' fees, interest, costs, and any appropriate injunctive relief.

## COUNT VI
### Unjust Enrichment
### (On Behalf of the Nationwide Class)

188.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189.    By means of Defendant's wrongful conduct alleged herein, Defendant knowingly sold the Products to Plaintiff and Class Members in a manner that was unfair, unconscionable, and oppressive.

190.    Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and the Class Members. In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

191.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

192.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

193.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from selling the Products to Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

194.    The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Class. Defendant should be compelled to return in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by Defendant.

## RELIEF DEMANDED

195.    WHEREFORE, Plaintiff, individually and on behalf the Class Members, seeks judgment and relief against Defendant, as follows:

a)  For an order declaring: (i) this is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed Classes described herein; and (ii) appointing Plaintiff to serve as representative for the Classes and Plaintiff's counsel to serve as Class Counsel;

b)   For an order enjoining Defendant from continuing to engage in the unlawful conduct set forth herein;

c)  For an order awarding restitution of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

d)  For an order requiring disgorgement of the monies Defendant wrongfully acquired by its illegal and deceptive conduct;

e) For compensatory and punitive damages, including actual and statutory damages, arising from Defendant's wrongful conduct and illegal conduct;

f) For an award of reasonable attorneys' fees and costs and expenses incurred in the course of prosecuting this action; and

g) For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all causes of action so triable.

Dated: May 9, 2022

**Good Gustafson Aumais LLP**

*/s/ Christopher T. Aumais*
Christopher T. Aumais (Cal. Bar No. 249901)
2330 Westwood Blvd., No. 103
Los Angeles, CA 90064
Tel: (310) 274-4663
cta@ggallp.com

**Shenaq PC**

/s/ Amir Shenaq
Amir Shenaq, Esq.*
3500 Lenox Road, Ste 1500
Atlanta, GA 30326
Tel: (888) 909-9993
amir@shenaqpc.com

**The Keeton Firm LLC**

/s/ Steffan T. Keeton
Steffan T. Keeton, Esq.*
100 S Commons Ste 102
Pittsburgh PA 15212
Tel: (888) 412-5291
stkeeton@keetonfirm.com

*Pro hac vice forthcoming*

*Counsel for Plaintiff and the Proposed Class*